# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 31, 2010

No. 08-30001

Charles R. Fulbruge III
Clerk

UNITED HEALTHCARE INSURANCE CO

Plaintiff - Intervenor Defendant-Appellee-Cross-Appellant

v.

ANGELE DAVIS, Commissioner

Defendant - Appellant-Cross-Appellee

v.

VANTAGE HEALTH PLAN, INC; PRESTON TAYLOR; GLORIA TAYLOR; LEON PRICE; SHERRA FERTITTA HICKS,

Intervenor Plaintiffs - Appellants-Cross-Appellees

v.

HUMANA INSURANCE COMPANY; HUMANA HEALTH BENEFIT PLAN OF LOUISIANA, INC,

Intervenor Defendants - Appellees-Cross-Appellants

----------------------------------------------

HUMANA INSURANCE COMPANY; HUMANA HEALTH BENEFIT PLAN OF LOUISIANA, INC

Plaintiffs - Appellees-Cross-Appellants

v.

No. 08-30001

ANGELE DAVIS; TOMMY D TEAGUE

Defendants - Appellants-Cross-Appellees

---

Appeals from the United States District Court
for the Middle District of Louisiana

---

Before JOLLY and DENNIS, Circuit Judges, and JORDAN, District Judge.[*]

E. GRADY JOLLY, Circuit Judge:

This appeal presents questions relating to the dormant Commerce Clause and the Contract Clause of the United States Constitution. The district court granted a permanent injunction enjoining the implementation of La. R.S. § 42:802.1 ("Act 479" or "the Act"), on the basis that it violated the dormant Commerce Clause, because it effectively favored Louisiana insurance companies in bidding for health insurance coverage for state employees. However, the district court held that the Act did not violate the Contract Clause by interfering with the plaintiffs' contracts with the State. Thus everybody now appeals something. Defendants, Angele Davis and Tommy D. Teague (the "State"),[1] and Intervenors, Vantage Health Plan ("Vantage") and the Covered persons, appeal the permanent injunction and the ruling on the dormant Commerce Clause. Plaintiffs, United Healthcare Insurance Company ("UHC") and Humana Insurance Company ("Humana"), cross-appeal the district court's holding that the Act did not violate the Contract or Due Process Clauses. We conclude that the district court erred on both issues. Because the State, by choosing with whom it did business, was acting as a participant in—and not a regulator

---

[*] District Judge of the Southern District of Mississippi, sitting by designation.

[1] Tommy Teague is the CEO of the Office of Governmental Benefits and Angele Davis is the Commissioner of Administration; both were sued in their official capacities.

of—the insurance market, the Act fell within the market participant exception, and the dormant Commerce Clause was therefore not a bar to its actions. However, the Act was invalid, as applied, because it interfered with the plaintiffs' current contracts in violation of the Contract Clause. Accordingly, we reverse the district court's judgment in favor of the plaintiffs declaring the Act invalid under the Commerce Clause, vacate the district court's permanent injunction enjoining implementation of the Act, and remand for further proceedings not inconsistent with this opinion.

I.

The State of Louisiana offers health care to its employees and retirees and their dependents ("enrollees"). The Office of Governmental Benefits (OGB), an executive branch state agency, arranges for the coverage of the State's enrollees by contracting with health insurance companies; it also contributes approximately 75% of the premiums for its enrollees. In the past, the OGB has offered both self-funded/self-insured plans (those for which the OGB pays benefits itself and carries the risk of the claims) and fully-funded/fully-insured plans (those for which the insurance company pays the benefits and carries the risk of the claims). In 2006, the OGB undertook actuarial studies that indicated that the State would save significant costs by offering only self-insured plans (with the exception of a fully-insured Medicare plan for state retirees). Accordingly, in August of 2006 the OGB issued a Notice of Intent to Contract (NIC) to several health insurance firms seeking Administrative Services Only (ASO) contracts for its Exclusive Provider Organization (EPO) and HMO plans, and an NIC for a Medicare Advantage plan (MAPD). After the bidding process, OGB awarded an ASO contract to Humana for a self-insured HMO plan, and one to UHC for a self-insured EPO plan. It also awarded a separate contract to Humana to administer the MAPD plan. The ASO contracts were for one year (July 2007–July 2008) but included an option exercisable by OGB for two one-

year renewals. The Humana MAPD agreement was for three years, to terminate in July 2010.

Incorporated into each final agreement were the contract itself, the NIC, and the proposal submitted by the insurance company in response to the NIC. Under the contracts, the insurance companies were to provide services including enrolling participants, preparing and distributing informational materials to participants, issuing identification cards, determining claim eligibility and paying eligible claims, reviewing appeals and grievances, and reporting to the OGB. Among other administrative responsibilities, the insurance companies agreed to follow certain procedures for an annual enrollment period, the time during which employees could select their plans for the year, change their coverage, or add eligible dependents. The cost for the enrollment drive was to be paid by the insurance companies. Other than payment for services, OGB's responsibilities included determining the eligibility of employees and regularly updating the insurance company with eligibility changes (which occurred due to an employee beginning or ending employment or acquiring a new spouse or dependent). The insurance companies were to be paid on a fee-per-covered-employee-per-month basis.

Vantage is a Louisiana HMO that in previous years had contracted with OGB to offer a fully funded HMO to state employees in one region of the state. When OGB decided to switch to only self-insured plans, Vantage did not submit a bid in response to the NIC because it could not offer self-insured ASO services. It wrote a letter to OGB requesting an NIC for a fully insured plan, but OGB declined to issue one.

Act 479 was signed into law in July, 2007. The Act mandates that the OGB solicit proposals in each region of the state from "Louisiana HMOs" and that the OGB must contract with any Louisiana HMO in each region (up to three) that submitted a "competitive" bid for a fully funded HMO plan. The Act

4

defines a "Louisiana HMO" as one that

> (1) Offers fully insured commercial and/or Medicare Advantage products; (2) Is domiciled, licensed, and operating within the state; (3) Maintains its primary corporate office and at least seventy percent of its employees in the state; and (4) Maintains within the state its core business functions which include utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations.

La. R.S. § 42:802.1. It was enacted shortly after the beginning of the 2007–2008 fiscal year (which runs from July to July) but became effective for that fiscal year, and required that OGB hold an extraordinary enrollment period for the 2007-2008 year (in addition to the annual enrollment period that had already been held pursuant to its UHC and Humana contracts). The Act does not require the OGB "to utilize any insurance product that increases costs to the plan of benefits as determined by the independent actuarial process," but requires that "the comparison shall be based on at least twelve months experience beginning no earlier than January 1, 2008."

On August 1, 2007, as required by the Act, the OGB issued an NIC for a fully funded plan. The NIC was limited to Louisiana HMOs, though the Act did not require that it be so limited. Vantage submitted a bid in response to the NIC, but the parties never entered a contract. UHC and Humana filed federal suits seeking declaratory and injunctive relief, challenging the Act under the Commerce Clause, Contract Clause, and Due Process Clause of the federal Constitution; their suits were consolidated in the district court. Vantage then intervened, as did four individuals (the "Covered Individuals"). The district court issued a Temporary Restraining Order (TRO) enjoining implementation of the Act, stating that it likely violated the Contract Clause. On October 31, 2007, after a hearing, the Court granted UHC's and Humana's motions for a permanent injunction, concluding that the Act violated the dormant Commerce

No. 08-30001

Clause, but not the Contract or Due Process Clauses. Vantage and the Covered Persons ("Intervenors") filed a Motion for New Trial or to Alter or Amend Judgment, which UHC and Humana opposed. The district court denied the Intervenors' motions. The Intervenors and the State now appeal the district court's determination that the Act violated the Commerce Clause. Humana and UHC cross-appeal the court's determination that the Act did not violate the Contract or Due Process Clauses.

## II.

We review the district court's conclusions of constitutional law *de novo*, and any subsidiary factual findings for clear error. *Allstate Ins. Co. v. Abbot*, 495 F.3d 151, 160 (5th Cir. 2007).

## A.

We first address the plaintiffs' appeal of the district court's dormant Commerce Clause holding.[2] The Commerce Clause, U.S. Const. art. I, § 8, cl. 3, grants Congress the authority to regulate commerce among the states; the dormant Commerce Clause, which the Supreme Court has inferred from the text of the clause, prevents a state from enacting regulations that discriminate against out-of-state entities or burden interstate commerce. *Granholm v. Heald*, 544 U.S. 460, 472 (2005). The Supreme Court has recognized an exception, however, when the state is acting as a market participant instead of as a market regulator. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976). Courts treat the question of whether the state is acting as a market participant as a threshold question for dormant Commerce Clause analysis. *White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 210 (1983) ("Impact on out-of-

---

[2] Although, as discussed in Part II.B. below, we conclude that the Act violates the Contract Clause of the Constitution, the Contract Clause conclusion is time-sensitive because the relevant contracts will expire soon after this opinion issues. Therefore, we address the plaintiffs' Commerce Clause challenge as well.

state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause.").

A state is a market participant if it is purchasing or selling a product or service; in such cases, it can choose its contracting partners as if it were a private party and can choose to deal preferentially with in-state entities. *Hughes*, 426 U.S. at 809-10. A state may be acting as a market participant even when the effects of its actions extend beyond the privity of its own contracts (for instance, if it imposes conditions on the parties with whom it contracts) if it is expending its own funds to enter the contract and the conditions it imposes "cover[] a discrete, identifiable class of economic activity in which the [state] is a major participant." *White*, 460 U.S. at 211 n.7. In *White*, the mayor of Boston issued an executive order requiring that all construction projects funded by the city be performed by at least half Boston residents. Although the order effectively imposed conditions on contracts between contractors and their employees, the Court noted that "[e]veryone affected by the order is, in a substantial if informal sense, 'working for the city.'" *Id*. The Court acknowledged that there were "some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," but did not define those limits. *Id*.

Later cases have further defined the limits of the market participant exception. The exception does not automatically apply simply because a state participates in some way in the market it is otherwise regulating. For instance, in *Wyoming v. Oklahoma*, 502 U.S. 437, 456 (1992), the Supreme Court invalidated an Oklahoma statute that required that all Oklahoma electricity plants use at least 10% Oklahoma coal; the Court acknowledged that the state was a market participant in the coal market in that it purchased coal for its own

plant, but held the statute was invalid because it also regulated private plants' purchases. *See also SSC Corp. v. Smithtown*, 66 F.3d 502, 512 (2d Cir. 1995) ("A state's actions constitute 'market participation' only if a private party could have engaged in the same actions."). Thus, a state cannot regulate others in the market in which it participates; the doctrine only protects the state's participation itself.

Further, a state does not act within the market participant exception when its actions significantly affect markets other than the market in which it is a participant by imposing conditions on parties with whom it contracts. That is, the market participant exception does not allow a state to "impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of [the] particular market" in which it is a participant. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 97 (1984). In *South-Central Timber*, Alaska attempted to sell timber subject to a requirement that the buyer agree to process the timber in Alaska. The Court held that although Alaska was acting as a seller in the timber market, its actions violated the dormant Commerce Clause because it was not a participant in the "downstream" market of timber processing. *Id.* at 95. The Court noted that Alaska's processing requirement went beyond normal commercial behavior, in that "the seller usually has no say over, and no interest in, how the product is to be used after the sale." *Id.* at 96. *See also Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 64 (1st Cir. 1999) ("Under *South-Central Timber*, states may not use the market participant exception to shield otherwise impermissible regulatory behavior that goes beyond ordinary private market conduct."). If the market participant exception allowed a state to impose conditions in any market tangentially related to the one in which the state participated, the Court noted, the exception would have "the potential of swallowing up the rule" imposed by the dormant Commerce Clause. *South-Central Timber*, 467 U.S. at 98.

Here, the parties agree that Louisiana participates in the health insurance market by using its own funds to pay for its enrollees' insurance and to contract with health insurance providers. UHC and Humana contend, and the district court held,[3] that the Act impermissibly goes beyond the health insurance market and regulates downstream markets in customer call centers, IT services, claim payment processing, and the other enumerated "core business functions" in which Louisiana is not a participant, by requiring a "Louisiana HMO" to maintain those business functions within the state.

We believe that the district court erred in its characterization and conclude that the Act falls within the market participant exception. First, the Act's list of activities that must be performed in Louisiana does not constitute "regulation" at all; rather, the list is merely a definition of the State's preferred contracting partners. Humana characterizes Louisiana's requirements as imposing conditions on out-of-state insurance companies by forcing them to make significant changes in their operations in order to benefit from the Act. We do not think, however, that the purpose or effect of the Act is to force insurance companies to do anything at all. The in-state requirements are merely a definition of the State's preferred contracting partners. The Act does not slightly suggest that, in making the definition so exclusive, the State seeks to make national insurance companies relocate their administrative services into Louisiana; to the contrary, the Act reflects an opposite legislative goal, that is, to assure that OGB (in contracting for state employees' insurance) would have only to deal with home-grown companies like Vantage.[4] Further, unlike in

---

[3] The district court did not address the market participant exception in its original ruling, but did so in its ruling on the Intervenors' motion for a new trial.

[4] The Seventh Circuit has rejected an argument similar to the plaintiffs', upholding a local business preference that gave local bidders a 2% advantage over nonlocal bidders. The court noted that the plaintiff was "free to contract with other parties without being subject to the local business preference," and thus was not "required" to do anything by the regulation.

9

No. 08-30001

*South-Central Timber*, where the state required a timber buyer "to deal with a stranger to the contract after completion of the sale," Louisiana's requirements apply only for the duration of the State's contracts; that is, they apply only while the State, as a participant in the market for insurance contracts, "retain[s] a continuing proprietary interest in the subject of the contract." *South-Central Timber*, 467 U.S. at 96, 99. The Act's definition of a "Louisiana HMO" simply does not have characteristics of a regulation.[5]

Second, the Act does not have a regulatory effect on a market downstream from the market in which the State participates. The only markets affected by the Act are those for services that the contracts explicitly require the insurance companies to perform; they are the very "administrative services" of the Administrative Services Only contracts. Each of the "core business functions" listed in the Act is expressly referenced in the contracts or in the NIC. In *South-Central Timber*, Alaska argued that it participated in the "processed timber market" by selling timber that would later be processed; however, it "acknowledge[d] that it *participate[d] in no way in the actual processing*." *South-Central Timber*, 467 U.S. at 98 (emphasis added). Here, Louisiana does participate directly in the markets for call centers, IT services, claims processing, and other administrative services: it has contracted to purchase

---

*J.F. Shea Co. v. Chicago*, 992 F.2d 745, 748 (7th Cir. 1993).

[5] We would not allow a state to use a purported "definition" to impose de facto regulation that would violate the dormant Commerce Clause. For instance, if in *South-Central Timber* Alaska had said that it would only do business with "in-state" purchasers, and had defined "in-state" purchasers as those that processed timber within Alaska, the Supreme Court easily would have seen through the state's wording and struck down the law as an improper regulation of conduct. Different phrasing would not have allowed Alaska to avoid the fact that it was fundamentally requiring timber purchasers to act in a certain way and that its requirement significantly impacted a market in which the state did not participate. Here, on the other hand, the fundamental nature of the Act's requirement is as a definition; no party (other than the OGB) will change its behavior because of it.

No. 08-30001

those services from Humana and UHC. The "downstream market" doctrine is therefore inapposite.

Accordingly, we conclude that the Act falls within the market participant exception and does not violate the dormant Commerce Clause.

B.

We turn now to UHC and Humana's cross-appeal. As we have earlier indicated, the district court held that the Act violated the dormant Commerce Clause, but that it did not violate the Contract Clause. Now that we have revived the Act under the dormant Commerce Clause, we must determine whether it also survives under the Contract Clause.

The Contract Clause prohibits states from passing any law that "impair[s] the Obligations of Contracts." U.S. Const. art. I, § 10. To determine whether a state law has impaired its own contractual obligations for the purposes of the Clause, we apply the Supreme Court's three-step analysis. First, we must determine whether the law substantially impaired a contractual relationship with the state.[6] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). Second, if so, we examine the state's asserted justification for the impairment, which must be a significant and legitimate public purpose. Third, if the public purpose is adequate, we ask whether the challenged law was "reasonably necessary" to achieve the purpose. *Id.* at 412-13. We do not defer completely to the legislature's judgment because of the possibility that the state is acting in its own self interest regarding the contract. *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 25-26 (1977).

---

[6] Our analysis assumes, as the parties do, that the relevant contract is with the state. The standard is different when the state law interferes with purely private contracts (which would be the case if the Act interfered with the contracts between the insurance companies and their enrollees).

11

No. 08-30001

1.

An important consideration in our substantial impairment analysis is the extent to which the law upsets the reasonable expectations the parties had at the time of contracting, regarding the specific contractual rights the state's action allegedly impairs.[7] *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 506 (5th Cir. 2001). "[L]aws which subsist at the time and place of the making of a contract . . . enter into and form part of it," *U.S. Trust*, 431 U.S. at 19 n.17, but the court also "should consider the expectations of the parties with respect to changes in the law." *Lipscomb*, 269 F.3d at 504. "[T]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). However, a law that "technically alter[s] an obligation of a contract" does not substantially impair it if the alteration merely "restrict[s] a party to those gains reasonably to be expected from the contract." *City of El Paso v. Simmons*, 379 U.S. 497, 515 (1965). To determine whether an impairment was substantial, the Supreme Court has considered "factors that reflect the high value the Framers placed on the protection of private contracts," namely, the parties' entitlement to rely on rights and obligations set by the contract so that they can "order their personal and business affairs according to

---

[7] The State relies on *Charles River Bridge v. Warren Bridge*, 36 U.S. 420 (1837), to argue that the subject obligations in state contracts must have been *explicit* in order to find a violation of the Contract Clause. But in *Charles River Bridge*, the Court's analysis was not based on the Contract Clause; it was based on the unmistakability doctrine; that is, the rule that "in grants by the public, nothing passes by implication." *Id.* at 546. More recently, the Court has held that the unmistakability doctrine is not applicable to "humdrum supply contracts," which do not implicate limitations on sovereign authority. *United States v. Winstar Corp.*, 518 U.S. 839, 880 (1996). A state cannot "bargain away" its police power, and therefore the Contract Clause is inapplicable if the contract "surrender[s] an essential attribute of [the state's] sovereignty." *Lipscomb*, 269 F.3d at 505. But the contracts here were for run-of-the-mill administrative services for a limited duration; the State's primary responsibility was financial, and the State does not contend that the contracts limited its sovereign authority. *Charles River Bridge* and the unmistakability doctrine are therefore inapposite.

their particular needs and interests." *Allied Structural Steel*, 438 U.S. at 245. In *Allied Structural Steel*, the Court found that the state had impaired a private contract when it "superimposed pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake." *Id*. at 240. The Court considered that the parties "had no reason to anticipate" the new obligations, that they had relied on their previously contracted obligations for ten years, and that the challenged law "chang[ed] the company's obligations in an area where the element of reliance was vital—the funding of a pension plan." *Id*. at 246.

Courts look to terms of the contract to determine the parties' reasonable expectations, including whether the risk of a change in the law was contemplated at the time of contracting. *Energy Reserves Group*, 459 U.S. at 414-16. In *Energy Reserves Group*, the Court upheld a Kansas statute imposing price controls on natural gas. The Court considered that not only was the natural gas market heavily regulated at the time the parties entered the contract, but the contract itself included terms that adjusted for changes in gas price regulation, so the parties must have known that their "contractual rights were subject to alteration by state price regulation." *Id*. at 415-16.

Here, the district court gave two reasons for its conclusion that the Act did not violate the Contract Clause. We conclude that its first reason—that the contracts were terminable at will by OGB—does not prevent a finding of contract impairment. The court seemed to assume, without explanation, that the power to terminate the contracts at will necessarily includes the lesser power to impair those contracts, and that therefore these contractual powers meant that OGB could modify its obligations and those of the plaintiffs without violating the Contract Clause. However, neither the district court nor the parties point to any authority that supports the proposition that the power to terminate a contract

13

enfolds the power to impair it for the purposes of the Contract Clause.[8]  Because the Act did not terminate the contract, as the OGB had reserved the right to do, but instead made the plaintiffs' obligations more onerous, the termination clauses do not save the State from Contract Clause scrutiny.

Second, the district court found that no provision of the contracts guarantees exclusivity to any of the plaintiffs and thus concluded that the State's allowing additional plan options, in a new bidding process, could not impair any right or obligation under such contracts.  The plaintiffs contend that the contracts' lack of "exclusivity" is irrelevant in determining whether these contracts were impaired.  It may be true, they argue, that each plaintiff knew that it would not be the only carrier with an ASO contract and that enrollees would choose between four types of plans; however, both parties expected, and were effectively assured, that the number of plans would be limited to those in the 2007 NICs.  Instead, the Act introduced the possibility that enrollees would choose from five or more plans, up to nearly thirty.  This increase of available choices would have the effect of decreasing each company's number of enrollees.  Further, the plaintiffs point out that the court did not address the plaintiffs' showing that the addition of an extraordinary enrollment period imposed unexpected costs associated with the process of conducting a new enrollment drive.  In short, the plaintiffs conclude, the district court's reliance on the lack of exclusivity in the plaintiffs' contracts is legally insufficient for its determination that UHC and Humana's contracts were not substantially impaired by the Act.

---

[8] The only case cited by Vantage for that proposition, *Dartmouth College v. Woodward*, 17 U.S. 518, 712 (1819), actually only held that the state legislature could not take away powers granted in the state's corporate charter for Dartmouth, which the court determined was a contract, when the power to do so was not reserved in the grant.

No. 08-30001

We agree that the district court erred in its analysis of the Contract Clause. Our review of the record indicates that the Act impairs Humana's and UHC's contracts in two substantial ways.[9] First, the record does in fact establish that, in conjunction with the NICs, the contracts effectively assured that no new plans would become available for the 2007–2008 year. This contractual expectation is further demonstrated by the Louisiana Attorney General opinion issued in response to a request from Vantage: "OGB is bound by the terms of the NIC" and "any contract that falls within the scope of the NIC must be awarded according to the terms of the NIC." Op. No. 07-0063. The AG does not opine whether an NIC for a fully insured HMO would fall within the scope of the earlier ASO NIC, but OGB itself determined that it would, and consequently OGB could not lawfully solicit bids for fully insured HMO plans for the 2007–2008 year without breaching its contracts.[10]

We thus can see that UHC, Humana, and the State, that is, the parties to the contracts, all had the same understanding as to the effect of the contracts and the NIC. They understood that the type and number of plans available to enrollees for that year would be limited to those sought in the NIC. This understanding is bolstered by the State's confirmation in a formal Q&A session—prior to the letting of the contract—that no fully funded plans would be offered alongside the self-funded plans. The plaintiffs relied on that expectation when they calculated their bids and signed contracts, all with the understanding that once the bids were let, the competition for enrollees would

---

[9] Because of the delay between the Act's original enactment and this opinion, the effect of lifting the district court's injunction at this point would be slightly different from the effect of the Act if it had been implemented in 2007. However, because the relevant contracts have been extended and are in effect for several more months, we conclude that the Act continues to substantially impair those contracts.

[10] OGB stated at the time that any contract for a fully-insured HMO Plan would "provide the very services sought in the [August 2006] NIC." Further, the OGB considered the Act an attempt to "circumvent" its contracts with the plaintiffs.

15

be between four plans: one EPO, one PPO (administered by the state), one HMO, and one Medicare plan (for retirees).[11] Unlike in *Energy Reserves Group*, nothing in the contracts indicates that the parties understood that there was a possibility that the landscape of plan options was subject to change.[12] *See Energy Reserves Group*, 459 U.S. at 414-16.

Second, the Act interferes with Humana's and UHC's contracts by mandating an unexpected and extraordinary enrollment period in the middle of the contract year. The contracts and the NIC provide for a single annual enrollment period and list the insurance companies' obligations regarding the enrollment drive. But the Act mandates an additional "extraordinary" enrollment period to allow enrollees to choose any new plan options offered by Louisiana HMOs. The insurance companies had accounted for the cost of one enrollment drive in their bids (estimated as approximately $300,000); thus, paying for another, unexpected enrollment drive would offset their expected returns from the contracts in a way that was not foreseeable when the contracts began.

These impairments are substantial and disrupt the purpose of the contracts at issue here; that is, to allow the parties to rely on their contractual expectations of approximate numbers of enrollees and the approximate expense of administering the plans. By entering into contracts with the OGB the plaintiffs specifically intended to foreclose the risks of undergoing an additional enrollment period and having to compete for enrollees with unexpected

---

[11] Humana explains the importance of that expectation: the resulting loss of enrollees would lower the companies' revenue from the contracts because the insurance companies are paid per enrollee, and providers in Humana's plan network will terminate or renegotiate their contracts with Humana based on the lower number of participants in the plan.

[12] Vantage and the State rely on contractual provisions allowing for changes in the number of enrollees to argue that the plaintiffs foresaw a possible loss of enrollees. These provisions, however, only reflect the relatively small shifts in enrollees that occur when employees change jobs or acquire new family members.

additional plans. Avoiding these risks allowed the companies to plan for the year ahead financially, and to enter into other agreements (for instance, with providers in their networks). The Act's spoiling of the parties' contractual expectations regarding these risks is the type of impairment that the Contract Clause prohibits. *See Allied Structural Steel*, 438 U.S. at 245.

2.

Because we have concluded that the Act substantially impaired UHC's and Humana's contracts, we must next examine whether the impairment was justified. The district court did not address the second and third prongs of the Contract Clause analysis because it concluded that the plaintiffs failed to meet the first prong of the test. The record before us, however, is sufficient to allow us to conclude as a matter of law that the State lacked adequate justification for the Act. We therefore need not reach the third prong of the analysis (whether the impairment was reasonably necessary), and we conclude that the Act violates the Contract Clause.[13]

To justify impairing a contract with the state, the law's public purpose must be one that implicates the state's police power, such as by remedying a "broad and general" social problem. *Lipscomb,* 269 F.3d at 504-05. Providing a benefit to a narrow group or special interest is insufficient justification. *Id*. To this point: In *Allied Structural Steel*, the challenged Minnesota law was enacted when a division of a large motor company closed its Minnesota plant and attempted to terminate its pension plan, which would have financially harmed its terminated employees in that state. 438 U.S. at 247-48. The statute imposed

---

[13] *See also Matter of Tex. Extrusion Corp*., 844 F.2d 1142, 1156 (5th Cir. 1988) ("Although the district court did not reach the merits of appellants' challenge of the order approving the Disclosure Statement, considerations of judicial economy convince us to address these issues in this appeal."). The pull of judicial economy is especially strong here because delaying a decision on the merits would not permit the parties to adjust their behavior according to our decision by the time their annual contracts are arranged in April.

No. 08-30001

a "pension funding charge" on certain, narrowly defined employers who terminated their pension plan or closed a Minnesota office. *Id.* at 238. The Court noted that the statute applied only to very few employers, and only in very rare situations, and concluded that the law "can hardly be characterized . . . as one enacted to protect a broad societal interest rather than a narrow class." *Id.* at 249.

Justifications for contractual impairments that the Supreme Court has found to be acceptable have been exercises of the state's sovereign authority to protect its citizens and prevent abuses of its contracts. *See, e.g.*, *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934) (upholding a statute altering the terms of mortgages in response to "an economic emergency which threatened the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence"); *Energy Reserves Group*, 459 U.S. at 416-17 ("Kansas has exercised its police power to protect consumers from the escalation of natural gas prices caused by deregulation."); *City of El Paso*, 379 U.S. at 511-14 (upholding a statute that rescinded prior contracts when the statute's purpose was to remedy widespread abuse of those contracts ).

In this case, the record indisputably demonstrates that the Act is narrowly focused on benefitting in-state HMOs (indeed, a specific one) and is not a broad exercise of the State's police power. The representative who drafted the bill met only with the President and CEO of Vantage for input. The law applies only to a narrow class of HMOs that operate almost entirely within Louisiana. OGB noted in a veto letter to the governor that "the legislature has neither formulated nor articulated a statement of public policy" on the bill. The Act was proposed in response to the OGB's decision to stop offering a fully insured HMO, and, more directly, in response to the failure of Vantage's efforts to convince the OGB to offer it a contract.

18

No. 08-30001

Given the State's burden to justify its impairment of its own contracts, from the face of the Act, the events surrounding its enactment, and from its effect we cannot accept the State's assertions about justifications other than economic protectionism. The district court concluded (in its Commerce Clause analysis) that the Act was enacted for economic protectionism purposes. The State has failed to meet its burden to produce evidence supporting any other justification. Further, any impairment to the plaintiffs' contracts was caused by the timing of the implementation of the Act's requirements, which were to be effective while the plaintiffs' contracts were still in effect. The State has not made any effort to explain or justify this timing. *Cf. Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984). In sum, we conclude that the Act violates the Contract Clause insofar as it is effective during the course of the plaintiffs' contracts.[14]

C.

The plaintiffs' substantive due process claim mirrors their Contract Clause argument; they argue that the Act interfered with substantially the same rights in the contract that it impaired for purposes of the Contract Clause. Because we have concluded that the Act is void under the Contract Clause, we will not address the Due Process claim.

III.

For these reasons, we conclude that the Act does not violate the dormant Commerce Clause. The Act, as applied to the contracts before us, does violate the Contract Clause and therefore is invalid as applied. The judgment of the district court declaring Act 479 to be unconstitutional as a violation of the Commerce Clause is REVERSED and the judgment of the district court

---

[14] Although the point is obvious, we should note that our holding concerning the Contract Clause does not address the effect of the Act on any contracts except those before us today.

No. 08-30001

permanently enjoining the implementation of Act 479 is VACATED. We REMAND for further proceedings not inconsistent with this opinion.

No. 08-30001

DENNIS, Circuit Judge, concurring in part, dissenting in part:

I concur in the majority's conclusion that Act 479 (the "Act") is unconstitutional because it violates the Contracts Clause of the United States Constitution. I respectfully dissent, however, from the majority's decision that the Act does not violate the Constitution's dormant Commerce Clause.

The Act, on its face, explicitly discriminates against out-of-state health care insurers in order to protect in-state insurers from interstate commerce competition. The Act, in effect, erects a barrier to the sale of health care insurance in Louisiana by non-Louisiana health care insurers which seek to engage in interstate commerce in Louisiana. The state and the defendants have failed to show that the Act advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. Therefore, the Act is facially invalid under the dormant Commerce Clause. Moreover, contrary to the majority's decision, the Act is not exempt from dormant Commerce Clause scrutiny under the market participant exception, because it interferes with the natural functioning of the interstate market through prohibition and burdensome regulation. Accordingly, under the Supreme Court's teachings, the district court's judgment striking the Act as infringing upon the dormant Commerce Clause should be affirmed.

I.

The district court correctly determined that Act 479 violates the dormant Commerce Clause because it facially and effectively discriminates against Non-"Louisiana HMOs" that seek to engage in interstate commerce in Louisiana and the state has failed to demonstrate, or even allege, that it has no other means to advance a legitimate local interest.

The Supreme Court's decisions establish "that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but

21

also directly limits the power of States to discriminate against interstate commerce." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). This "negative" or "dormant" aspect of the Commerce Clause prohibits "'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 128 S. Ct. 1801, 1808 (2008) (quoting *New Energy Co.*, 486 U.S. at 273-74); *see also Granholm v. Heald*, 544 U.S. 460, 472 (2005) ("[S]tate laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" (quoting *Or. Waste Sys. Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994))). As a result, "[a] discriminatory law is 'virtually *per se* invalid.'" *Davis*, 128 S. Ct. at 1808 (quoting *Or. Waste Sys.,* 511 U.S. at 99 (1994)). State statutes that discriminate against interstate commerce "are routinely struck down unless the discrimination is demonstrably justified by a valid" public purpose, "unrelated to economic protectionism." *New Energy Co.*, 486 U.S. at 274 (citations omitted).

"This rule is essential to the foundations of the Union." *Granholm*, 544 U.S. at 472. The dormant Commerce Clause "effectuate[s] the Framers' purpose to 'prevent a State from retreating into the economic isolation' 'that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Davis*, 128 S. Ct. at 1808 (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) and *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979)) (other citations and alterations omitted). "The history of our Commerce Clause jurisprudence has shown that even the smallest scale discrimination can interfere with the project of our Federal Union." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 595 (1997).

No. 08-30001

Act 479 violates the dormant Commerce Clause because on its face it discriminates against out-of-state HMOs by granting competitive advantages to "Louisiana HMOs": (1) the Act requires the state Office of Group Benefits ("OGB") to solicit bids from "Louisiana HMOs," or "home-grown" HMOs,[1] La. Rev. Stat. Ann. § 42:802.1(A); (2) the Act further requires the OGB to offer up to three "competitive" insurance plans from "Louisiana HMOs" to state employees in each of nine in-state regions, *id*.; but (3) the Act does not require the OGB to solicit or offer state employees any plans issued by out-of-state HMOs, *id*.

Act 479 defines a "Louisiana HMO" as an insurer which: (1) offers fully-insured insurance products; (2) "[i]s domiciled, licensed, and operating within the state"; (3) "[m]aintains its primary corporate office and at least seventy percent [(70%)] of its employees in the state"; and (4) "[m]aintain[s], within the state, its core business functions which include utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations." La. Rev. Stat. Ann. § 42:802.1(C). Thus, to take advantage of the competitive advantages Act 479 grants "Louisiana HMOs," an out-of-state insurance company must become a "Louisiana HMO" by meeting all of the foregoing criteria, including changing its domicile to Louisiana, moving its primary corporate office to Louisiana, hiring or relocating seventy percent (70%) of its employees so they are Louisiana residents, and relocating and maintaining all of its listed core business functions in Louisiana.

In this manner, the Act provides competitive advantages to "Louisiana HMOs" and reciprocal disadvantages to out-of-state HMOs. Unlike "Louisiana

---

[1] Majority Op. 9.

HMOs," outsiders must incur extra overhead costs just to stay up to date on the state's bidding and solicitation processes, as the OGB is not obliged to keep them informed of when bidding is occurring or the contents of any solicitation. Moreover, because the Act requires the OGB to accept virtually any competitive bid by a "Louisiana HMO," but does not oblige it to accept any bid from a Non-"Louisiana HMO," an out-of-state HMO's cost-benefit analysis may prohibit it from competing with "Louisiana HMOs." As the district court suggested, an out-of-state HMO's direct competition with a "Louisiana HMO" is a "vain and useless act" because Act 479 requires that up to three competitive bids by "Louisiana HMOs" within each in-state region must be accepted, notwithstanding bids by Non-"Louisiana HMOs." The Act guarantees that an outsider's doing business in Louisiana is more risky and expensive and less profitable than the same business run by a "Louisiana HMO" in seeking to capture the same market.

Thus, Act 479 makes it virtually impossible for a Non-"Louisiana HMO" engaging in national, regional or multistate interstate business to compete with "Louisiana HMOs" in Louisiana.  It is essential to companies doing business on a national or regional basis to achieve economies of scale by centralizing their core business functions or contractually outsourcing them to other interstate trading partners. For such a company to become a "Louisiana HMO," and thereby to become competitive with "home-grown" "Louisiana HMOs," would require it to drastically change its corporate mission and structure, abandon achieved economies of scale and sever contractual relations with its interstate trading partners. In effect, Act 479 dictates that an out-of-state insurance company engaged in interstate commerce on a national or regional basis simply cannot compete on an equal footing with "Louisiana HMOs."

No. 08-30001

It is the Supreme Court's concern about the "economic protectionism" of state laws like Act 479, *viz.*, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors," that has driven "[t]he modern law of what has come to be called the dormant Commerce Clause." *Davis*, 128 S. Ct. at 1808. As the Supreme Court has specifically declared, a state violates the dormant Commerce Clause when it "require[s] an out-of -state firm 'to become a resident in order to compete on equal terms'" with in-state firms. *Granholm*, 544 U.S. at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)).

Because Act 479 is discriminatory both on its face and in effect, "the virtually *per se* rule of invalidity provides the proper legal standard here, not the *Pike* [*v. Bruce Church, Inc.*] balancing test." *Or. Waste Sys.*, 511 U.S. at 100. *See also Pike,* 397 U.S. 137, 142 (1970).[2] As a result, the Act must be invalidated unless defendants can "'sho[w] that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Or. Waste Sys.*, 511 U.S. at 100-01 (1994) (alteration in original) (quoting *New Energy Co.*, 486 U.S. at 278) (citing *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342-43 (1992)). Thus, the Supreme Court requires "that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.'" *Or. Waste Sys.*, 511 U.S. at 101 (quoting *Oklahoma*, 441 U.S. at 337). "The State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Or. Waste Sys.*, 511 U.S. at 101 (quoting *Oklahoma,* 441 U.S. at

---

[2] "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

337) (citing *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 406-07 (1984) and *Maryland v. Louisiana*, 451 U.S. 725, 759-760 (1981)).

Here, the state advances three justifications for the enactment of Act 479 and its discrimination against Non-"Louisiana HMOs" engaging in interstate commerce with the state, *viz.*, "to provide State enrollees with more health care options," to decrease costs and to "provide consistent health care benefits to State enrollees throughout the state." Preston Taylor et al. Br. 22; Tommy D. Teague & Angele Davis Br. 19; Vantage Health Plan, Inc. Br. 28. Providing state employees and retirees with additional, competitively priced health care options and consistent benefits are certainly legitimate local purposes, but the state has not shown or even suggested why these purposes could not be adequately served by reasonable nondiscriminatory alternatives. Because the state has offered no legitimate reason for Act 479 to discriminate against Non-"Louisiana HMOs" or to prevent or hinder them from engaging in interstate business in Louisiana on an equal basis with "Louisiana HMOs," the Act is facially invalid under the dormant or negative Commerce Clause.

## II.

Act 479 should not be held to be immune from the limitations of the dormant Commerce Clause under the market participant exception. By Act 479, Louisiana regulates the interstate commerce activities of out-of-state Non-"Louisiana HMOs" by heavily burdening their competition with "Louisiana HMOs" for state contracts unless they become "Louisiana HMOs"; that is, unless they abandon their interstate, national, and regional operations based on economies of scale and become intra-state insurers with their bases of operations exclusively in Louisiana. Because the state through Act 479 thus interferes with

the natural functioning of the interstate market by acting as a regulator and prohibitor of interstate insurance business, and not merely as an ordinary purchaser of insurance would act, it is not exempt from the limitations of the dormant Commerce Clause under the market participant exception.

In recognizing the market participant exception, the Supreme Court in *Hughes v. Alexandria Scrap Corp.* emphasized that the exception would <u>not</u> permit a state to "interfere[] with the natural functioning of the interstate market either through prohibition or through burdensome regulation." 426 U.S. 794, 806 (1976). To explain the exception, the *Alexandria Scrap* Court surveyed a number of cases in which it had found that states had unconstitutionally burdened interstate commerce through either prohibition or regulation:

> In the most recent of those cases, *Pike v. Bruce Church*, [a] burden was found to be imposed by an Arizona requirement that fresh fruit grown in the State be packed there before shipment interstate. The requirement prohibited the interstate shipment of fruit in bulk, no matter what the market demand for such shipments. In *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525 (1949), a New York official denied a license to a milk distributor who wanted to open a new plant at which to receive raw milk from New York farmers for immediate shipment to Boston. The denial blocked a potential increase in the interstate movement of raw milk. Appellee also relies upon *Toomer v. Witsell*, 334 U.S. 385 (1948), in which this Court found interstate commerce in raw shrimp to be burdened by a South Carolina requirement that shrimp boats fishing off its coast dock in South Carolina and pack and pay taxes on their catches before transporting them interstate. The requirement increased the cost of shipping such shrimp interstate. In *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 49 (1928), a Louisiana statute forbade export of Louisiana shrimp until they had been shelled a[nd] beheaded, thus impeding the natural flow of freshly caught shrimp to canners in other States. Both *Shafer v. Farmers Grain Co.,* 268 U.S. 189 (1925), and *Lemke v. Farmers Grain Co.*, 258 U.S. 50 (1922), involved efforts by North Dakota to regulate and thus disrupt the interstate market in grain by imposing burdensome regulations upon and

controlling the profit margin of corporations that purchased grain in State for shipment and sale outside the State. And in *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923), the Court found a burden upon the established interstate commerce in natural gas when a new West Virginia statute required domestic producers to supply all domestic needs before piping the surplus, if any, to other States.

*Alexandria Scrap*, 426 U.S. at 805-06. "The common thread of all these cases," the Court said, "is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Id*. at 806. Further, the Court in *Alexandria Scrap* strongly reaffirmed that the dormant Commerce Clause "principle makes suspect any attempt by a State to restrict or regulate the flow of commerce out of the State. The same principle, of course, makes equally suspect a State's similar effort to block or to regulate the flow of commerce into the State." *Id*. at 808 n.17 (citing as "[s]ee, [e].g.," *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951); and *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361 (1964), and as "[s]ee generally" *Great A&P Tea Co. v. Cottrell*, 424 U.S. 366 (1976)).

Louisiana and the majority, in refusing to recognize that Act 479 facially runs afoul of this near century of precedents, struggle mightily to analogize the instant case to *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204 (1983), and to distinguish it from the Court's most elaborate market participant analysis in *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82 (1984) (plurality opinion of White, J.). But neither of these cases can properly be invoked to shield Act 479 from the rigorous scrutiny called for by the dormant Commerce Clause.

No. 08-30001

In *White*, the Supreme Court upheld against a dormant Commerce Clause challenge a mayoral order that required, for construction projects funded by the city, that at least half of contractors' workforces be Boston residents. The order placed no other demands relevant to the Commerce Clause on the contractors seeking to do business with the city. *See White*, 460 U.S. at 205-06 & n.1. The Court explained that unlike prior unconstitutional statutes, the mayoral order did not "'attempt to force virtually all businesses that benefit in some way from the economic ripple effect'" of the city's construction contracts "'to bias their employment practices in favor of the [city's] residents.'" *Id*. at 211 & n.7 (alteration in original) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 531 (1978)). However, in contrast with the mayoral order in *White*, Act 479 not only requires that out-of-state HMOs must employ seventy percent (70%) Louisiana workers, it also "attempt[s] to govern the private, separate economic relationships of [Non-"Louisiana HMOs" and their] trading partners." *South-Central Timber*, 467 U.S. at 99. Act 479 demands that, to be competitive, out-of-state insurers must become "Louisiana HMOs" by becoming domiciled in Louisiana, relocating their bases of operations there, and altering their internal structure and operations so as to become vertically integrated, having all of their core business functions in Louisiana, thereby abandoning their centralized national or regional operations, interstate outsourcing and economies of scale.

Further, in *White* the Court explained that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," but the Court declared it unnecessary "to define those limits" in that case because "[e]veryone affected by the order [was], in a substantial if informal sense, 'working for the city.'" 460 U.S. at 211 n.7. *See also South-Central Timber*, 467 U.S. at 95 ("The

29

No. 08-30001

fact that the employees were 'working for the city' was 'crucial' to the market-participant analysis in *White.*" (quoting *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 219 (1984))); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 63 (1st Cir. 1999) (*White* "did not involve an attempt by Boston to require all contractors with the city to employ Boston residents in all of their other projects, a situation more akin to this case. Here, Massachusetts is attempting to impose on companies with which it does business conditions that apply to activities not even remotely connected to such companies' interactions with Massachusetts.").

Act 479's regulatory impact affects more than just the state's contracts with HMOs. It significantly interferes with the natural functioning of the interstate insurance market by imposing restrictions upon out-of-state companies seeking to do business in Louisiana. Further, under Act 479, those restrictions can be alleviated only by transforming out-of-state companies into "Louisiana HMOs" with the relocation of their domiciles, base of operations, seventy percent (70%) of their workforce, and all of their core business functions to Louisiana. Thus, Act 479 reaches beyond the parties' privity in state insurance contracts to also regulate out-of-state insurers' relationships with their non-Louisiana employees, their non-Louisiana corporate affiliates, and their non-Louisiana trading partners handling their outsourced core business functions.

Finally, the majority's attempt to distinguish *South-Central Timber*—the Supreme Court's most detailed articulation of the market participation exception—is unsuccessful. In fact, *South-Central Timber* is closely analogous to the present case and demonstrates that the market participant exception cannot salvage Act 479 because it impermissibly regulates interstate markets in which Louisiana is not a participant.

In *South-Central Timber* the Supreme Court held that the state of Alaska, as a seller of timber, could not require that timber from state lands be processed within the state before being exported. 467 U.S. at 84. The Court recognized that Alaska was a market participant with respect to selling timber, but found that its statute was unconstitutional because the state was not participating in other aspects of the timber industry, such as processing. *Id.* at 98. The Court explained that while Alaska could "choos[e] its own trading partners," it could not "attempt[] to govern the private, separate economic relationships of its trading partners." *Id.* at 99. Such conduct was an impermissible effort to alter the "vertical" structure of the industry. *Id.* at 98. The Court emphasized that "the [market-participant] doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity." *Id.* at 97. Instead, the test for whether the state is a market participant is "whether [the state] is acting as an *ordinary* market participant would act." *Nat'l Foreign Trade Council*, 181 F.3d at 65 (emphasis added).

Contrary to the majority's protestations, as in S*outh-Central Timber*, Act 479 impermissibly "attempt[s] to govern the private, separate economic relationships of its trading partners." 467 U.S. at 99. Act 479 dictates that to compete on an even playing field with "Louisiana HMOs," Non-"Louisiana HMOs" must change the location at which they maintain their utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations, all of which, in this modern economy, are likely outsourced to third parties. Thus, Act 479 reaches outside the market in which the state participates and attempts to

No. 08-30001

regulate and interfere with markets and relationships in which the state does not participate, *viz.*, the relationships and markets between Non-"Louisiana HMOs" and their third party trading partners, such as information technology services companies. Thus, the Act also attempts to alter the vertical structure of Non-"Louisiana HMOs" by requiring them to incorporate and relocate core business functions to Louisiana.

An "ordinary" market participant is concerned with the price and quality of the product and services purchased, rather than with having a company's trading partners located within a particular state. *See South-Central Timber*, 467 U.S. at 98 ("[S]imply as a matter of intuition a state market participant has a greater interest as a 'private trader' in the immediate transaction than it has in what its purchaser does with the goods after the State no longer has an interest in them."). One insurance company witness testified, and we can take judicial notice, that national and regional insurers create economies of scale by centralizing or outsourcing many of their services, which results in lowering the cost of insurance. Accordingly, Act 479's mandate that Non-"Louisiana HMOs" reconstitute themselves and their trading partners as integrated intra-state entities in order to compete fairly with "Louisiana HMOs" for the state's business demonstrates that the state is not acting as an ordinary market participant. The Supreme Court has clearly "reject[ed] the contention that a State's action as a market regulator may be upheld against Commerce Clause challenge on the ground that the State could achieve the same end" if it were a market participant in each of the affected markets. *Id.* at 98-99.

"The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by

32

No. 08-30001

statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market." *South-Central Timber*, 467 U.S. at 98. Moreover, the "market" in which the state is participating must be "narrowly defined," or the market participant exception will erode the dormant Commerce Clause. *Id.* at 99.

Thus, Louisiana can impose conditions on its purchase of insurance that an ordinary market participant would, so long as the "insurance market" which the conditions affect is narrowly defined. But it cannot by statute impose conditions that have a substantial regulatory effect outside of that particular market. By Act 479, Louisiana goes beyond participating in a market as would an ordinary purchaser of insurance. Rather, Act 479 imposes conditions that have substantial, even prohibitive, regulatory effects outside of the market in which the state participates as an insurance purchaser. Act 479 requires out-of-state insurers, in order to fairly compete for the state's business, to relocate their domiciles, operating bases, workforces, and core business functions in Louisiana. These statutory effects would interfere with and regulate the insurers' relationships and markets with their third-party trading partners in interstate commerce. Consequently, Louisiana's actions under Act 479 having such regulatory effects are not entitled to the market participant exception from the dormant Commerce Clause.

For these reasons, in my view, the judgment of the district court holding Act 479 invalid as a violation of the dormant Commerce Clause should be affirmed.